ROBERTS, J.,
dissenting.
¶ 43. The majority finds that the chancellor was correct when she found that the Hinds County School Board acted arbitrarily and capriciously when it transferred R.B. to the Hinds County alternative school. The majority also finds that the School Board violated R.B.’s due process rights when it expelled R.B. After a thorough review of the record, I am convinced that the School Board acted on substantial evidence when it transferred R.B. to the alternative school. Stated differently, I am of the opinion that the School Board did not act arbitrarily or capriciously. I am convinced that the School Board’s decisions incident to both of R.B.’s disciplinary referrals were reasonable and within the sound judgment and discretion of the School Board. Further, I cannot conclude that the School Board violated R.B.’s due process rights. Accordingly, I respectfully dissent.
¶ 44. I must mention a troublesome matter not addressed by the majority nor raised by the parties — -the fact that the chancellor opened the record for additional testimony. After the Board expelled R.B., R.B. appealed to the chancery court. The chancellor reversed the Board. In so doing, the chancellor heard live testimony and allowed the submission of documentary evidence and exhibits. When the matter went before the chancellor, the chancellor sat as an appellate court. In reviewing the Board’s decision, the chancellor, like this Court was limited to consider the record before the Board. Mississippi State Tax Comm’n v. Mississippi-Alabama State Fair, 222 So.2d 664, 665 (Miss.1969) (any appeal of an administrative agency will be considered a “limited appeal.”) The chancellor should not have allowed the presentation of new evidence or considered evidence that was not in the record before the Board. Even so, neither party objected at trial. As such, that additional and improperly considered evidence is in the record before this Court.
I. The February 2004 Incident
¶ 45. The chancellor found that the School Board acted arbitrarily and capriciously when it transferred R.B. to the Main Street Alternative School. The *506 chancellor also found that the School Board’s decision lacked the support of substantial evidence. The majority affirms both decisions.
¶ 46. R.B.’s transfer to the Main Street Alternative School arose out of events that transpired during the early part of February of 2004. As of February of 2004, R.B. was twelve years old. He was in the sixth grade at Byram Middle School. On February 4, 2005, a female student told Assistant Principal Chad Shealy that R.B. tried to sell her marijuana while she waited on campus to be picked up from school. The next day, Shealy passed that accusation along to Principal David Campbell. At Campbell’s request, Shealy and Deputy Scott Linschoten escorted R.B. to Campbell’s office. Campbell confronted R.B. with the allegation.
¶ 47. R.B. denied that he had marijuana, but when requested by Campbell, he was able to name two other students who had marijuana.[4] Campbell asked R.B. whether he would consent to a search. R.B. consented and a search of R.B.’s backpack turned up the “device” at issue. R.B. also had some CD’s, which are prohibited by school policy. R.B. removed his shoes and his socks, and then emptied his pockets. When asked whether he had anything else on his person, R.B. reached into his pants and pulled out a cigarette lighter.
¶ 48. Again, R.B. was asked if he had anything else on his person that he should not have at school. R.B. then began to undo his pants as though he was going to remove them. Campbell immediately stopped R.B. and called R.B.’s father, D.L.B. Campbell informed D.L.B. that R.B. was pulling things out of his underpants. Campbell requested that D.L.B. come to the school to further search his son. D.L.B. told Campbell that he and his lawyer would be at the school in thirty minutes.
¶ 49. When D.L.B. arrived, Campbell offered to let him use his private restroom to complete the search of R.B. D.L.B. became visibly upset. D.L.B. refused any further search of his son. He demanded that his son be arrested so he could sue the School Board. Campbell showed D.L.B. the device found in R.B.’s backpack. Because of Byram Middle School’s zero-tolerance policy, R.B. was suspended until the Board could hear the matter. Campbell recommended expulsion of R.B.
¶ 50. As the majority points out, the matter then went before the Appeals Committee. The Appeals Committee reviewed Campbell’s recommendation, Campbell’s statement, and Deputy Linschoten’s statement in which Deputy Linschoten described the device as a “pocket knife.” The Appeals Committee also considered R.B.’s prior disciplinary record.[5]
¶ 51. R.B. and his parents received notice of and were present at the Appeals Committee hearing. They were also allowed to speak on R.B.’s behalf. The Appeals Committee concluded that the device was a prohibited weapon. The Appeals Committee did not follow Campbell’s recommendation of expulsion. Instead, the Appeals Committee recommended that *507 R.B. be placed in the Main Street Alternative School for the remainder of the semester and a portion of the semester to follow. The Appeals Committee submitted its recommendation to the School Board for final approval.
¶ 52. At the School Board meeting, R.B. was again present and afforded an opportunity to be heard. The School Board ultimately upheld the Appeals Committee’s recommendation conditional upon the superintendent’s conclusion that the device was a weapon. The middle school sent a photocopy of the device to the superintendent. The superintendent concluded that the device qualified as a knife, as did the School Board.
¶ 53. The classification of the device as a weapon pursuant to Miss.Code Ann. § 97-37-17 has been a matter of some debate in this case. The chancellor and the majority find that there was no substantial evidence that the device was a knife. The majority calls it a “nail file device.” However, the majority also admits that “one prong of the device ... resembles a knife blade.” Deputy Lin-schoten called it a “pocket knife.” It could arguably be described either way. A familiar and reasonable description would be that of a small “Swiss Army Knife.”
¶ 54. Regardless of all previous nomenclature of the device, based on my examination, the device can be described as having three articulating retractable components all connected to a housing at a single point. Those three articulating retractable components are a can opener, a nail file, and one other component. That third component is the one at issue. In my opinion, it is not unreasonable to conclude that the third component is an “edged instrument” or an “instrument capable of causing bodily harm.”
¶ 55. If there is any doubt, it is resolved by the testimony of the student and R.B.’s mother, L.B. During R.B.’s testimony, the following exchange occurred:
Q. But do you consider it a knife?
A. Yeah.
Q. All right. Do you consider this a butter knife because of the degree of sharpness it has or a lack of sharpness it has?
A. Lack of sharpness.
Q. Okay, but you do agree it’s a knife?
A. Yeah.
Clearly, R.B. twice conceded that the device was a knife. While being questioned regarding the nature of the device, L.B. testified as follows:
Q. And as you now have got it displayed and in its open form, tell us the three implements that it contains.
A. I know this (indicating) is a nail file. I used this quite a bit. I used this part right here (indicating) — these two parts right here, I would slit open medicine and containers, plastic, to go through like that (indicating), to open up plastic things.... These are punctures (indicating); you can use that to puncture something, and yes, sir, I did.
THE COURT: You don’t really want to go there.
L.B. Yes, ma’am.
THE COURT: Remember what I told you this morning?
L.B. Yes, ma’am.
THE COURT: Okay.[6]
*508 Q. And then this implement (indicating) is a what?
A. My sheer.
Q. A slicer.
A. Yes, sir.
Q. You have even said you used it as a box cutter.
A. Yes, sir — box opener.
L.B. characterized the device as having slicing, slitting, and puncturing capabilities. L.B. also tacitly agreed that the object was capable of cutting.
¶ 56. The majority finds that the Appeals Committee’s decision was not supported by substantial evidence because (a) the Appeals Committee did not examine the device, and (b) the Appeals Committee based its decision on Deputy Linschoten’s written report. The majority notes that, according to D.L.B., the Appeals Committee did not conduct any real inquiry as to whether the device was prohibited. The majority cites no authority for the prospect that the written report of a security officer, without more, is not substantial evidence upon which an Appeals Committee may make a decision. Likewise, the majority cites no authority that an Appeals Committee may not reach a decision unless it first examines the alleged contraband. In many cases, the actual contraband simply may not be available to a reviewing administrative body.
¶ 57. The majority also finds that the School Board’s decision was not supported by substantial evidence. The majority reaches this conclusion on the grounds that (a) the School Board abdicated its authority, and (b) the School Board did not conduct an independent review. Not only that, the majority finds that the School Board acted arbitrarily and capriciously in that it relied “solely” on the Appeals Committee’s report and did not personally review the device. I disagree.
¶ 58. The majority concludes that the School Board abdicated its responsibility as provided in Mississippi Code Annotated § 37-7-301(e) when it allowed the superintendent to make the final determination as to the appropriate discipline of R.B. Pursuant to Section 37-7-301(e), school boards have the authority:
To suspend or to expel a student or to change the placement of a pupil to the school district’s alternative school ... for misconduct in the school or on school property ... in the determination of the school superintendent or principal, renders that pupil’s presence in the classroom a disruption to the educational environment of the school or a detriment to the best interest and welfare of the pupils and teacher of such class as a whole, and to delegate such authority to the appropiiate officials of the school district.
(emphasis added). After careful review, I cannot find that the School Board abdicated its authority. The superintendent did not make the final decision as to whether R.B. would be expelled. The School Board only asked the superintendent to determine whether the device was a weapon. Once the superintendent determined that the device qualified as a weapon, the School Board made the decision to expel R.B.
¶ 59. Not only that, the record illustrates that the School Board received a photocopy of the implement. D.L.B. testified that the superintendent told him that she showed the School Board a photocopy of the device. D.L.B. also testified that he believed the superintendent when she told him that. Wilkinson testified and confirmed that the School Board received an accurate copy of the device before the School Board decided to uphold the Appeals Committee’s recommendation. Combined with D.L.B.’s testimony, I would *509 conclude that the School Board was fully informed before it reached its decision.
¶ 60. The majority also concludes that the superintendent’s decision was arbitrary and capricious because the superintendent relied on the Appeals Committee’s report and the faxed photocopy of the device. The majority takes exception to the fact that the photocopy of the device did not match D.L.B.’s description. There is a simple and obvious reason that the photocopy did not match D.L.B.’s description — D.L.B. did not accurately describe the device.
¶ 61. The majority notes that D.L.B. was “outraged” at the depiction of the device. Like the majority, D.L.B. described the device as a “nail file device.” A fingernail file is certainly one of the three components of the device, but it is not the sole component. The majority points out that the superintendent and the School Board only reviewed a photocopy of one component of the device. Be that as it may, there is also a very obvious and reasonable explanation for this-the photocopied component was the only component alleged to be a knife.
¶ 62. R.B. claims that a nail file is an exempted object under this statute. I agree. However, the implement does not only contain a nail file — it also has two other components. The fact that the implement contains a nail file does not exempt it from being a weapon if it has other dangerous components.
¶ 63. The majority finds that the photocopy faxed to D.L.B. was disturbing because it showed the device at “approximately three times its actual size.” While the photocopy of the device that D.L.B. received does depict the device at somewhat larger than its actual size, this fact has no bearing on the superintendent’s review of the device. The superintendent reviewed a photocopy of the device that was either actually sized or possibly slightly larger than actual size. Contrary to the majority opinion, the photocopy is almost identical in size to the actual implement and it is sufficiently detailed. When extended, the edged component measures four and one-quarter inches. Further, I find no authority requiring the School Board to review the actual contraband in order to make its decision. In any event, a reasonable person could easily determine the nature of the component by viewing the photocopy.
¶ 64. Considering these facts, I am of the opinion that the School Board was well within its rights to transfer R.B. to the alternative school. Carrying a weapon on school property is against school policy. It is also illegal. Pursuant to Miss.Code Ann. § 97-37-17(d)(4) (Rev.2006):
It shall be a misdemeanor for any person to possess or carry, whether openly or concealed, any BB gun, air rifle, air pistol, bowie knife, dirk, dagger, slingshot, leaded cane, switchblade knife, blackjack, metallic knuckles, razors and razor blades (except solely for personal shaving), and any sharp-pointed or edged instrument except instructional supplies, unaltered nail files and clips and tools used solely for the preparation of food, instruction and maintenance on educational property.
The implement confiscated on February 5, 2004, fits under the statutory meaning of a prohibited weapon on school premises. One of the device’s components was an edged instrument. Based on growing concerns over school violence, it is not surprising that a school would enact a zero tolerance policy regarding the possession of a weapon on school grounds. Further, the student handbook notified parents in the Hinds County public school district that weapons were not allowed on school grounds. Accordingly, I fail to see how *510 there could be an insufficient basis for the School Board’s decision.
¶ 65. It is for the fact-finding body, in this case the School Board, to determine whether the “pocket knife” at issue could be classified as an “instrument considered to be dangerous and capable of causing bodily harm” or a “sharp-pointed or edged instrument.” See Clinton Mun. Separate Sch. Dist. v. Byrd, 477 So.2d 237, 242 (Miss.1985). We are not charged with determining the nature of the device. Rather, we are required to protect the student from an arbitrary ruling. Based on witness characterization of this object as a “knife” capable of slicing and penetrating boxes, I can not find that the School Board’s conclusion was unreasonable.
¶ 66. As mentioned, the School Board considered statements from Deputy Lin-schoten and Campbell. Both were involved with the confiscation of the device. Both had personal knowledge of its nature. Deputy Linschoten referred to the device as a “pocket knife.” To be specific, he listed the three components of the device as “a knife blade, a nail file, and a bottle opener.” While it is possible that a security officer’s classification, without more, might be insufficient evidence, compounded with an accurate picture of the implement, Campbell’s report, and R.B.’s prior record, at a minimum these documents are “more than a mere scintilla of evidence.” Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss.1983). The School Board reviewed an accurate picture of the device and statements of people with personal knowledge of the facts. In my opinion, this is a sufficient evidentiary foundation to warrant such a disciplinary action.
¶ 67. According to the majority, if the School Board had reviewed the device sufficiently, it would have concluded that the device was not a knife. The majority concludes that the School Board’s decision amounts to a “textbook example” of an arbitrary and capricious decision. I cannot agree. To borrow the majority’s analogy, based on a complete review of the facts, I am of the opinion that, like the chancellor’s decision, the majority’s decision amounts to a “textbook example” of this Court substituting its view for the School Board’s.
¶ 68. As for R.B.’s due process rights incident to the Appeals Committee’s decision and the School Board’s decision, I find no due process violations incident to either. Although Campbell recommended that R.B. be expelled, R.B. was not expelled.[7] There could be no violation of R.B.’s due process rights incident to the School Board’s decision to place R.B. in the Main Street Alternative School because R.B. is not guaranteed due process incident to such a decision. A student is guaranteed due process in an instance warranting expulsion because the loss of an opportunity to attend school and receive an education impacts a student’s property rights. See Goss v. Lopez, 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Expulsion contemplates the cessation of public education. However, R.B. was not expelled. Instead, R.B. was transferred to the Main Street Alternative School. Accordingly, there was no denial of R.B.’s property right to a public education and any argu *511 ment that R.B.’s due process rights were violated are misplaced. However, if the Board decided to expel R.B. outright for the knife incident, I would still find no due process violation. R.B. was given notice of the Appeals Committee hearing and an opportunity to be heard at that hearing.
II. The May 2004 Marijuana Incident
¶ 69. Approximately three and one-half months after the “pocket knife” incident, R.B. was expelled for possession of marijuana at the Main Street Alternative School. On May 19, 2004, R.B. was implicated among a group of students for possession of marijuana. The relevant factual background is evident from statements before the Appeals Committee and the School Board. Statements from two students, J.D. and D.M., indicated that R.B. had marijuana at school that day. D.M. indicated that R.B. sold marijuana to one student and gave more marijuana to another student. Security Officer Kelvin Mixon stated that he and Principal Bob Mohr escorted R.B. to the principal’s office to interview him regarding the fact that they received information that he had marijuana. Mixon asked R.B. to tell him where he had hidden the marijuana. According to Mixon, the marijuana was discovered behind some books in a bookshelf at the back of the classroom near where R.B. had been sitting. According to R.B.’s statement:
I, R.B., spoke with [J.D.] and he said I got some stuff for you, do you want to buy it and I told him I don’t fool with that then later on [D.M.] came in the classroom and yelled they’re snitching, then [J.D.] stood up and said “ol snap” and then he hid something behind the desk and threw two bags of marijuana to me and then said please hide this for me and I caught the marijuana and threw it on the bookshelf.
1170. Mohr recommended that R.B. be expelled from the Main Street Alternative School. The Appeals Committee met to review Mohr’s recommendation and heard R.B.’s version of the incident. The majority notes that R.B. received notice of the Appeals Committee hearing and that R.B. was afforded an opportunity to speak on his own behalf at the hearing. However, the Appeals Committee agreed with Mohr and recommended that R.B. be expelled. After the Appeals Committee submitted its recommendation to the School Board, the School Board agreed and expelled R.B. from the Main Street Alternative School.
¶ 71! R.B.’s statement could be construed as a quasi confession. He admitted that he had the marijuana in his possession, if only for a brief time. Since marijuana is illegal contraband, one can not own it — one can only “possess” it. Miss. Code Ann. § 41-29-139(a) (Rev.2005). That is, one can only exercise some degree of conscious control or dominion over marijuana. R.B. admitted that he hid marijuana for another student. J.D. and D.M. stated that R.B. had marijuana at school. Statements from Officer Mixon and Mohr confirmed that R.B. had dominion and control over the marijuana. Considering our standard of review, I would find that the School Board heard sufficient evidence to expel R.B.
¶ 72. The majority opines that R.B.’s due process rights were violated. It is important to consider just what due process rights R.B. has. Unfortunately, this body of law is not well-established by our statutory laws or our case law. We know that, at a minimum, R.B. is afforded due process in that he has rights to advance notice and a reasonable opportunity to be heard. Jones v. Bd. of Trustees of Pascagoula Mun. Sep. Sch. Dist., 524 So.2d 968, 972 (Miss.1988). Before he was expelled from the Main Street Alternative School, *512 R.B. received notice of the Appeals Committee hearing. He was also allowed to present his case to the Appeals Committee. I fail to see how R.B.’s due process rights were violated.
¶ 73. The majority cites Jones, 524 So.2d at 973, for the proposition that “ordinarily a student should be provided with a list of witnesses.” I interpret Jones differently. The precise language in Jones reads as follows:
The Fifth Circuit Court of Appeals has held that normally a pupil should be provided a list of witnesses along with an explanation of the charges. [Keough v. Tate County Board of Education, 748 F.2d 1077, 1083 (5th Cir.1984).] In [Warren County Board of Education v. Wilkinson, 500 So.2d 455, 460 (Miss.1986) ] this Court intimated that a list of witnesses was necessary; however, there the school board’s own rules required that a witness list be given.
Jones does not unequivocally hold that a student should ordinarily be provided with a list of witnesses. Instead, Jones followed Keough and Wilkinson. Jones clearly distinguished Wilkinson when it noted that a list of witnesses was necessary where the school board’s own rules required such a list.
¶ 74. In Keough, a student asserted that he should have received a list of witnesses and a summary of their testimony prior to a school board disciplinary hearing. 748 F.2d at 1081. The Fifth Circuit found that the student’s assertion was “not without some basis.” Id. The Fifth Circuit noted that “usually these safeguards should be afforded to satisfy the fourteenth amendment in cases involving long-term suspensions.” Id. (citations omitted) (emphasis added). However, the Fifth Circuit went on to note that “the process due may vary in particular cases depending upon the circumstances.” Id. Keough further instructed that “[t]he standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved.” Id. “Basic fairness and integrity of the fact-finding process are the guiding stars.” Id. at 1081-82.
¶ 75. The student in Keough received a list of witnesses and a summary of their testimony after he arrived at the school board hearing. Id. at 1082. The Fifth Circuit found that earlier notice of witnesses was not necessary to satisfy procedural due process. Id. According to Keough:
We are guided in our analysis by reason. Reason takes into account the reality that, though very serious, the matter we are considering is a routine disciplinary matter within a public school, and is not a sophisticated court trial involving complex fact or legal issues. With this predicate in mind, we first note that the Keoughs were fully apprised of the charges, the underlying facts supporting those charges, and the nature of the hearing.

Id.

¶ 76. Keough next pointed out that the witnesses “provided no surprises against which the Keoughs were unprepared to defend or which otherwise prejudiced their ability to present their case.” Id. Said differently, the Fifth Circuit found that the student “suffered no material prejudice by proceeding to hearing before the school board without a witness list” and the school board did not violate the student’s procedural due process rights. Id.
¶ 77. In my opinion, R.B. suffered no prejudice in that he was not surprised by any of the witnesses. He knew each and every person involved in the proceedings. *513 True enough, R.B. did not have an opportunity to cross-examine the student witnesses, because those witnesses were not personally present to testify against him and no authority unequivocally gives him that right.
¶ 78. The majority finds that a hearing should have been conducted so that R.B. could cross-examine J.D. and D.M. However, the School Board does not have the power to compel student attendance at a hearing. Jones, 524 So.2d at 973. See also Miss. Code Ann. § 37-7-301 (subpoena power is not listed under the board of trustee’s powers). If the School Board does not have subpoena power then there can be no right to compulsory process for the witness and hence no right of confrontation. Absent subpoena power, it is clearly reasonable for the Appeals Committee to rely on written reports and written statements from witnesses. What is more, from a policy standpoint, if a School Board were to compel testimony from students, such a course of action could lead to harassment of that student. D.L.B. testified:
I think when I asked Mr. Mohr who it was involving, that he told me as a matter of policy they couldn’t give out students’ names because they had a student who had been harassed by a parent because they had accused them kids of doing something in years past. Well, it might have been Dr. Eiland that told me that. Whenever I asked her who the other students were, she told me they couldn’t give me their names because of the fact there were kids in the past who had come forth and gave evidence, and if the parents found out who they were, they would get in trouble, so she said as a policy they just didn’t do that.
¶ 79. Neither R.B. nor anyone on his behalf ever attempted to cross-examine any school employee witness who was present. Moreover, when asked, R.B. stated he had no additional evidence or witnesses to present to the Appeals Committee. The Appeals Committee and the School Board considered a written report of the confiscation by two school employees, statements from students, and R.B.’s quasi confession. The marijuana was found right where R.B. said he hid it. Even if we assume that R.B. only hid the marijuana for another student, there was a significant amount of evidence that R.B. had dominion and control over marijuana in his possession. Finally, a chemical test revealed that it was, in fact, marijuana that was found. In my opinion, this evidence was sufficient to warrant expulsion.
¶ 80. To sustain a violation of procedural due process, the aggrieved party must show “substantial prejudice.” Jones, 524 So.2d at 972. In the second instance, as in the first, the School Board made a decision based on substantial evidence, while casting no substantial prejudice to R.B.’s due process rights. Considering the foregoing analysis, I am of the opinion that the chancellor’s ruling should be reversed and the original ruling of the School Board should be reinstated. Because the majority affirms the chancellor, I must respectfully dissent.
LEE AND MYERS, P.JJ., and GRIFFIS AND CARLTON, JJ„ JOIN THIS OPINION.

. R.B. was correct. Those two students admitted they had marijuana. One student had marijuana in his backpack. He claimed he bought it from the other student for five dollars. The other student later admitted that he had marijuana. He even produced the five dollars that he received for the marijuana. Both students were arrested.

. R.B.’s disciplinary record for the 2003-2004 school year contained complaints for using profanity, fighting, insubordination, and disrupting class. For those infractions, R.B. had been suspended, sent to in-school detention twice, and sent to Saturday detention.

. It is unclear why the chancellor intervened during L.B.'s cross-examination. The chancellor might have interfered with defense counsel's ability to conduct a thorough cross-examination. It is also unclear just what the chancellor meant when she said, “Remember what I told you this morning.”

. The chancellor ordered "both expulsions” expunged from R.B.’s record. R.B. was not expelled from Byram Middle School. As mentioned, School Boards are granted the authority "To suspend or to expel a student or to change the placement of a pupil to the school district's alternative school ... for misconduct in the school or on school property.” Miss.Code Ann. § 37-7-301(e) (emphasis added). By referring to those three outcomes in the disjunctive, the legislature clearly distinguishes expulsion from school and "changing placement” to an alternative school.